IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PHILIP D. EVANS,

      Plaintiff,

    v.

HOUSING AUTHORITY OF THE CITY
OF BENICIA a.k.a. BENICIA
HOUSING AUTHORITY, JULIE
PETERSON, and DOES 1-50,
inclusive,

      Defendants.

_____/

No. 2:07-CV-0391 JAM EFB

ORDER RE: DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

    Plaintiff Philip D. Evans ("Evans") brought a state court

action against his former employer Benicia Housing Authority

("BHA") and Julie Peterson ("Peterson") alleging civil rights

violations and various state law claims arising out of his

termination.  BHA and Peterson (collectively "Defendants")

removed the case to this Court on the basis of federal question

jurisdiction.  Defendants now move for summary judgment or, in

the alternative, summary adjudication pursuant to Rule 56(c) of

1

the Federal Rules of Civil Procedure.  Evans opposes the motion.

For the reasons set forth below, Defendants' motion as to

Peterson is DENIED and GRANTED as to BHA.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant BHA is an independent public agency created to

provide low-cost housing to the city of Benicia.  Its powers are

exercised through a Board of Commissioners ("Board") consisting

of members appointed by the Mayor of Benicia and confirmed by

the Benicia City Council.  Defendant Peterson is a former

manager and Executive Director of BHA.  Peterson was promoted to

Acting Executive Director in August 2004 and then to Executive

Director in December 2005.  As Executive Director, Peterson was

supervised by the Board of Commissioners, which is comprised of

seven Commissioners, five public Commissioners and two tenant

Commissioners whom reside in BHA's housing developments.

Plaintiff Evans is a former employee of BHA hired in

October 2002 as a bookkeeper.  In June 2003 Evans was promoted

to accountant and then to senior accountant in July 2004.  As an

accountant for BHA, Evans was responsible for various

bookkeeping and accounting functions.  In particular, Evans was

responsible for preparing monthly financial statements of all

---

[1] Because oral argument will not be of material assistance,
the Court orders this matter submitted on the briefs.  E.D. Cal.
L.R. 78-230(h).

2

BHA accounts, including the tenants' accounts receivables, collecting and organizing data for audits in compliance with the United States Department of Housing and Urban Development ("HUD") regulation, and preparing BHA's year-end financial statements.   Evans' duties also included updating the Executive Director on financial issues, including the status of tenant rent accounts.

From October 2002 to August 2004, Evans was supervised by Mike Flo, the Executive Director of BHA.   From August 2004 to June 2005, Evans was supervised by Peterson.   During the later time period, Evans allegedly observed Peterson working reduced hours.   Evans also discovered that certain past due rents were not being collected and that late fees were not being assessed to these accounts.   On several occasions from October 2004 to December 2004, Evans expressed his concerns about the tenant rent account irregularities to Peterson.   In particular, in December 2004, Evans sent an e-mail to Peterson alerting her that BHA was near the fiscal year-end audit and that he needed to explain the status of past due rents and adjustments owed by tenants.   In this e-mail, Evans mentioned a situation that might be viewed as a "related party transaction" which would have to be disclosed to auditors, namely that a tenant Commissioner had an outstanding rent balance.

In November 2004, Evans met with Phyllis McKeever ("McKeever"), the Chairperson of the BHA Board for lunch at a restaurant in Benicia.  During this meeting, Evans informed McKeever about the tenant rent account irregularities, including BHA's failure to collect on certain past due rents and to assess late fees to these accounts.  According to Evans, he also informed McKeever that Peterson was working reduced hours.  In autumn 2004, a Grand Jury investigation was commenced into the activities of BHA.  In late October 2004, Peterson received a letter from the Foreperson of the Solano County Grand Jury advising her that the Grand Jury had elected to review the methods and/or systems of the BHA as they relate to performing the duties and providing the services of the agency.  On November 19, 2004, Peterson went before the Grand Jury and testified about the general business operations of BHA.  On November 23, 2004, Evans went before the Grand Jury and testified about the tenant rent account irregularities and Peterson's reduced work hours.  Thereafter, Peterson asked Evans about his meeting with the Grand Jury, but he refused to reveal the substance of his testimony.  In January 2005, Evans met with Eric Huhtala ("Huhtala"), special agent with the HUD Office of the Inspector General ("OIG") and expressed his concerns about the tenant rent account irregularities and Peterson's reduced work hours.

Following his appearance before the Grand Jury, Evans claims that Peterson retaliated against him in various ways. Specifically, Evans claims that Peterson retaliated against him in the form of: (1) giving him unwarranted criticism, including placing several notes in his personnel file in December 2004 stating that an outside auditor was upset about Evans' attitude concerning an audit deadline; (2) refusing to approve a raise he was scheduled to receive starting in January 2005; (3) giving him a counseling memo reprimanding him for seeking overtime compensation after he attended the April 27, 2005 BHA Board meeting;[2] (4) preventing him from meeting with McKeever and another BHA Board member in early May 2005 to discuss the counseling memo he received from Peterson; and (5) placing him on administrative leave and eventually terminating him.

On June 2, 2005, Peterson allegedly observed Evans attempting to remove BHA files from the workplace and directed him to leave the files in his office.  On June 3, 2005, Evans received a memo from Peterson stating that he was being placed on administrative leave pending an investigation into the propriety of his actions regarding his attempt to remove BHA files from the workplace.  On June 7, 2005, Evans received a

---

[2] Evans was also reprimanded for seeking overtime compensation for time spent working past 5:00 p.m. on May 13, 2005 to meet a deadline on a report.

Notice of Proposed Action advising him that Peterson intended to terminate his employment effective June 15, 2005, and that he would be placed on paid administrative leave until that time. On June 16, 2005, Evans received a letter from Peterson terminating his employment.  Among the reasons cited for Evans' termination were acts of insubordination in the form of disregarding Peterson's directives and BHA procedures; namely, not to remove BHA files from the workplace and not to work overtime without prior approval.  The letter noted that Evans was dishonest with Peterson when she asked him if he had taken the BHA files home.  The termination letter also stated that Evans had been terminated for poor job performance and for behaving in a rude and uncooperative manner toward HUD staff, two auditors and Peterson.

On December 28, 2006, Evans filed the instant action in Solano County Superior Court against Defendants alleging civil rights violations pursuant to 28 U.S.C. § 1983 and various state law claims.  On February 26, 2007, Defendants removed the action to this Court on the basis of federal question jurisdiction.  On September 21, 2007, Defendants moved to dismiss the first, second, third, fourth, fifth, seventh, eighth and ninth claims for relief alleged in the Third Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  On December 11, 2007, this Court granted Defendants' motion,

dismissing each of these claims with prejudice.  As a result,
the only actionable claim remaining is Evans' sixth claim for
relief, violation of First Amendment freedom of speech and
association rights under § 1983.  On July 3, 2008, Defendants
moved for summary judgment on this claim.  On July 23, 2008,
Evans filed an opposition.

II. OPINION

A.   <u>Legal Standard</u>

Summary judgment is appropriate if "the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c).  The moving party bears the initial burden
of demonstrating the absence of a genuine issue of material
fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).
Where the nonmoving party will have the burden of proof on an
issue at trial, the movant's burden may be discharged by
pointing out to the district court that there is an absence of
evidence to support the nonmoving party's case.  <u>See</u> <u>id.</u> at 325;
<u>Miller v. Glenn Miller Productions, Inc.</u>, 454 F.3d 975, 987 (9th
Cir. 2006).  "Summary judgment for a defendant is appropriate
when the plaintiff fails to make a showing sufficient to
establish the existence of an element essential to [his] case,

7

and on which [he] will bear the burden of proof at trial."
Miller, 454 F.3d at 987 (internal quotation marks omitted).

If the moving party sustains its burden, the burden then shifts to the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324 (citing Fed.R.Civ.P. 56(e)); Miller, 454 F.3d at 987.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."  Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).  Summary judgment is appropriate if, viewing the evidence and the inferences therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law.  Valandingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989).

B.   First Amendment Claim

Evans asserts claims for violation of his right to freedom of speech as well as his right to freedom of association.  The essence of Evans' claim is that Peterson retaliated against him because he exercised his First Amendment rights.  Although the parties approach these as two separate claims, the Court will

nonetheless treat Evans' First Amendment claim as one involving primarily speech rights insofar as the associational and speech rights are substantially intertwined.  See Hudson v. Craven, 403 F.3d 691, 698 (9th Cir. 2005) (where speech and associational rights under the First Amendment are substantially intertwined the case can be treated as one involving only speech rights).  To the extent Evans contends that his First Amendment claim implicates his right to associate with McKeever, the Grand Jury and special agent Huhtala, the Court finds that it is not purely associational.  The very purpose of these associational activities was to speak out about Peterson's conduct, an exercise that implicates speech rights.  Therefore, because the speech freedoms claimed to be infringed predominate over the associational claims, the Court will, for the most part, treat Evans' First Amendment claim as one involving violations of free speech rights.[3]

Public employees suffer a constitutional violation when they are wrongfully terminated or disciplined for making

---

[3] Evans contends that Peterson infringed his associational rights by retaliating against him for attending the April 27, 2005 BHA Board meeting. The Court finds that this alleged curtailment of First Amendment rights involves freedom of association rather than freedom of speech, i.e. Evans claims that Peterson retaliated against him for his attendance at this meeting.  As to the merits of this claim, the Court finds that Defendants failed to demonstrate that this claim fails as a matter of law.  Accordingly, Defendants are not entitled to summary judgment on this issue.

protected speech. <u>Marable v. Nitchman</u>, 511 F.3d 924, 929 (9th Cir. 2007) (citing <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968)). "To state a First Amendment claim against a public employer, an employee must show: 1) the employee engaged in constitutionally protected speech; 2) the employer took 'adverse employment action' against the employee; and 3) the employee's speech was a 'substantial or motivating' factor for the adverse action." <u>Marable</u>, 511 F.3d at 929 (citing <u>Coszalter v. City of Salem</u>, 320 F.3d 968, 973 (9th Cir. 2003)). To qualify as "constitutionally protected speech," the employee must have uttered the speech as a citizen, not an employee; because when public employees make statements pursuant to their official duties, those statements do not receive First Amendment protection. <u>Marable</u>, 511 F.3d at 929. Speech is protected only if the employee spoke "as a citizen upon matters of public concern" rather than "as an employee upon matters only of personal interest." <u>Thomas v. City of Beaverton</u>, 379 F.3d 802, 808 (9th Cir. 2004). "Speech that concerns issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection." <u>Coszalter</u>, 320 F.3d at 973. In contrast, "speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the

performance of governmental agencies, is generally not of public concern." Id.; see also United States v. National Treasury Employees Union, 513 U.S. 454, 466 (1995) (private speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer).  The question of whether speech is constitutionally protected is one of law, not fact.  Marable, 511 F.3d at 930.

If the employee can establish a prima facie claim, the burden shifts to the employer to demonstrate either that, under the balancing test established by Pickering, 391 U.S. at 568, the employer's legitimate administrative interests outweigh the employee's First Amendment rights or that, under the mixed motive analysis established by Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977), the employer would have reached the same decision even in the absence of the employee's protected conduct.  Thomas, 379 F.3d at 808.  The government must show by clear and convincing evidence they would have taken the same action, regardless of the protected speech.  Rivera v. United States, 924 F.2d 948, 954 n. 7 (9th Cir. 1991).

The employee bears the burden of showing that the speech at issue is constitutionally protected, and that it was a substantial or motivating factor in the adverse employment

action.   Keyser v. Sacramento City Unified School District, 265 F.3d 741, 750 (9th Cir. 2001).  An employee can satisfy his burden to show that constitutionally protected speech was a substantial or motivating factor in the adverse employment action in three ways.  Coszalter, 320 F.3d at 977.  First, the employee can introduce evidence regarding the proximity in time between the protected action and the allegedly retaliatory employment decision, from which a jury logically could infer that he was terminated in retaliation for his speech.  Id. Second, the employee can introduce evidence that his employer expressed opposition to his speech, either to him or to others. Id.  Third, the employee can introduce evidence that his employer's proffered explanations for the adverse employment action were false and pretextual.  Id.  If the employee discharges his burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct.  Keyser, 265 F.3d at 750.

In the present case, Evans maintains that he was wrongfully terminated in retaliation for engaging in the following instances of constitutionally protected speech: (1) communicating with Peterson in October and December 2004 concerning the tenant rent account irregularities; (2) communicating with McKeever concerning the tenant rent account irregularities, Peterson's reduced work hours and Peterson's

retaliatory conduct; (3) communicating with the Grand Jury concerning the tenant rent account irregularities and Peterson's reduced work hours; and (4) communicating with special agent Huhtala concerning the tenant rent account irregularities and Peterson's reduced work hours.  Defendants, for their part, contend that summary judgment is appropriate because Evans' communications with Peterson, McKeever and the Grand Jury do not constitute constitutionally protected speech insofar as the communications were made pursuant to Evans' official duties, not in his capacity as a citizen.[4]  Additionally, Defendants contend that, even assuming that Evans engaged in protected speech, summary judgment is appropriate because he cannot prove that this speech was a substantial motivating factor in Peterson's decision to terminate him inasmuch as Peterson had no knowledge of the substance of Evans' communications with McKeever, the Grand Jury or special agent Huhtala.  Finally, Defendants contend that, even assuming that Evans engaged in protected speech and that this speech was a substantial motivating factor in Peterson's decision to terminate him, summary judgment is appropriate because Peterson had legitimate non-retaliatory reasons for her decision.  The Court will address these arguments in turn below.

---

[4] Defendants do not argue that Evans' communications with special agent Huhtala was not constitutionally protected speech.

1.  <u>Constitutionally Protected Speech</u>

At the outset, the Court notes that Defendants do not argue, as a general matter, that the speech at issue did not involve matters of public concern.  Rather, Defendants argue that Evans' speech is not constitutionally protected because it was made pursuant to his official job duties, not as a private citizen.  To the extent Defendants do not argue that the speech at issue did not involve matters of public concern, the Court will assume, without deciding, that this speech involved matters of public concern.

With respect to Evans' statements to Peterson concerning the tenant rent account irregularities, the Court finds that this speech is not constitutionally protected because it was made pursuant to his official job duties.  It is undisputed that Evans', as a senior accountant for BHA, was assigned the task of preparing a monthly financial statement of BHA's tenants' accounts receivables and was responsible for updating Peterson on the financial status of these accounts.  Accordingly, because Evans uttered this speech pursuant to the execution of his responsibilities and official duties at BHA, not as a private citizen, this speech is not protected by the First Amendment.  See <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 421-24 (2005) (holding that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for

14

First Amendment purposes, and the Constitution does not insulate their communications from employer discipline).  Under Garcetti, speech made in the course of performing or fulfilling employment responsibilities is not entitled to First Amendment protection. To the extent Evans' claims that his free speech rights were violated because Peterson retaliated against him for refusing to disclose the substance of his testimony before the Grand Jury, the Court is unable to conclude, based on the record presented, that Evans conduct was not protected by the First Amendment. Defendants did not point to controlling authority demonstrating that this claim fails as a matter of law.

With respect to Evans' statements to McKeever in November 2004 concerning the tenant rent account irregularities, the Court finds that this speech is not constitutionally protected because it was made pursuant to Evans' official job duties. Although Evans initiated his communications with McKeever outside of work during his lunch hour, this speech was nonetheless uttered in the course of fulfilling his official responsibilities at BHA because the speech involved a complaint about a supervisor's misconduct and/or mismanagement in the form of failing to collect past due rents and assess late fees on delinquent tenant rent accounts.  See Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006) (internal complaints about supervisory failures or workplace mismanagement are consistent with the type

of activities the employee is professionally obligated to perform).  Accordingly, because Evans' speech to McKeever concerning the tenant rent account irregularities was related to activities Evans undertook in a professional capacity to further BHA's objectives and was uttered as an employee pursuant to his official responsibilities, not while acting as a private citizen, it is not protected by the First Amendment.  See Ceballos, 547 U.S. at 421-24.

In contrast, the Court finds that Evans' complaint to McKeever about Peterson's reduced work hours was not in any way part of his official job duties.  It is undisputed that Evans' job was to perform the tasks of a senior accountant at BHA, and that such tasks did not include pointing to improper actions of his supervisor whom he thought was misusing public funds by working reduced hours.  Evans had no official duty to ensure that his supervisor was working full-time.  Accordingly, because Evans' official job duties did not encompass the communications with McKeever concerning Peterson's reduced work hours, the Court finds that Evans' complaints were not made simply as an employee in performance of his duties but rather as a concerned citizen.

Finally, with respect to Evans' statements to McKeever in late April or early May 2005 requesting to meet with her and another BHA Board member, the Court finds that these statements

are not constitutionally protected speech.  As Defendants correctly point out, this speech did not involve a matter of public concern insofar as it merely involved an attempt by Evans to set-up a meeting to discuss what he perceived to be unfair discipline in the form of a counseling memo reprimanding him for seeking unauthorized overtime compensation.  This is true regardless of whether Evans' actually told McKeever the reason why he wanted to meet with her and the other BHA Board member, i.e., to discuss Peterson's alleged retaliation in response to his exercise of First Amendment rights.  Such speech did not involve a matter of public concern; rather, it involved an individual personnel dispute and grievance that would be of no relevance to the public's evaluation of BHA.  See McKinley, 705 F.2d at 1114 (speech is not of public concern when it deals solely with individual personnel disputes and is irrelevant to the public's evaluation of the governmental agency's actions).

   With respect to Evans' statements to the Grand Jury concerning the tenant rent account irregularities and Peterson's reduced working hours, the Court finds that this speech was not made pursuant to Evans' official job duties.  Testifying before the Grand Jury was not in any way part of Evans' official job duties.  It was clearly not within the scope of Evans' official job duties to testify before the Grand Jury about Peterson's alleged failure to collect past due rents and assess late fees

to delinquent tenant rent accounts.  Nor was it within the scope

of Evans' duties to testify before the Grand Jury about

Peterson's reduced work hours.  Rather, it was Evans' duty as a

citizen to expose such official malfeasance to broader scrutiny.

See Freitag, 468 F.3d at 545 (prison guard acted as a citizen

concerned with protecting her rights, not in the course of

discharging her duties as an officer, in complaining to a state

Senator and the California Office of the Inspector General

("IG") about the state's failure to take corrective action to

eliminate sexual harassment in the workplace because it was not

part of her official tasks to complain to the Senator or the IG

about the state's failure to perform its duties properly;

rather, it was her responsibility as a citizen to expose such

malfeasance to broader scrutiny); see also Marable, 511 F.3d at

932-33 (ferry engineer's complaint concerning his superiors'

corruption schemes was not speech made pursuant to his

employment duties because he was charged with the tasks of a

Chief Engineer, not with ensuring that his superiors abstained

from allegedly corrupt financial schemes).  Similarly, to the

extent Evans sent letters to the Grand Jury concerning the

tenant account irregularities, the Court finds that this speech

was not made pursuant to his official job duties.  Sending

letters to the Grand Jury about Peterson's alleged failure to

collect past due rents and assess late fees to delinquent tenant

rent accounts is not within the scope of Evans' official job duties.  Accordingly, because Evans' official duties did not encompass his communications with the Grand Jury, the Court disagrees with Defendants' contention that Evans' complaints were made simply as an employee in performance of his duties rather than as a concerned citizen.

    2.  <u>Substantial or Motivating Factor</u>

    Defendants contend that, even assuming that Evans engaged in protected speech, summary judgment is appropriate because he cannot prove that this speech was a substantial motivating factor in Peterson's decision to terminate him inasmuch as Peterson had no knowledge of the substance of Evans' communications with McKeever, the Grand Jury or special agent Huhtala.

    A plaintiff can show that retaliation was a substantial or motivating factor behind a defendant's adverse employment actions in three ways: (1) plaintiff can introduce evidence regarding the proximity in time between the protected action and the allegedly retaliatory employment decision, from which a jury logically could infer that the plaintiff was terminated in retaliation for his speech; (2) a plaintiff can introduce evidence that his employer expressed opposition to his speech, either to him or to others; and (3) the plaintiff can introduce evidence that his employer's proffered explanations for the

adverse employment action were false and pretextual.   <u>Coszalter</u>, 320 F.3d at 977.

To support his retaliation claim, Evans points to the temporal proximity between his protected speech and Peterson's various acts of retaliation, including Peterson's unwarranted criticisms, her failure to approve a previously authorized pay increase, her reprimand in the form of a counseling memo, and her decision to termination his employment.  Evans further points to evidence demonstrating that Peterson's decision to terminate him was pretextual.  Defendants, for their part, do not argue that these alleged instances of retaliation do not constitute adverse employment actions.  Rather, Defendants argue that Evans' speech was not a substantial or motivating factor in these acts because Peterson had no knowledge of the substance of Evans' communications with McKeever, the Grand Jury, or special agent Huhtala prior to her decision to terminate Evans.  In addition, Defendants argue that Peterson had separate and distinct non-retaliatory grounds for terminating Evans.  Because the Court at this stage must view the evidence in the light most favorable to Evans as the nonmoving party, the Court finds that there is a genuine issue of material fact on the issue of causation, that is, whether Evans' speech was a substantial or motivating factor in the retaliatory conduct alleged.  The Court finds that the temporal proximity in time between the

constitutionally protected speech and Peterson's alleged

retaliatory conduct (one to seven months) supports an inference

of retaliation.  See Coszalter, 320 F.3d at 977 (holding that a

proximity in time of between three and eight months is easily

within the time-range that can support an inference of

retaliation).  Beyond the bare facts of the timing, Evans has

introduced sufficient circumstantial evidence of causation to

avoid summary judgment.  Evans, for instance, offered evidence

indicating that during the period following his protected speech

(from November 2004 to June 2005) he was subject to retaliation

from Peterson while she was aware of the following: (1) his

concerns about the tenant rent account irregularities; (2) that

a complaint was filed with HUD concerning her reduced work

hours; (3) that a Grand Jury investigation into BHA had been

commenced; (4) that he testified before the Grand Jury; (5) that

he attended a BHA Board meeting on April 27, 2005; and (6) that

he contacted McKeever in late April or early May 2005 to set-up

a meeting with McKeever and another BHA Board member.  Evans

also introduced evidence indicating that one of Defendants'

proffered explanations for his termination was pretextual.

Defendants maintain that Evans was terminated, in part, for acts

of insubordination.  Specifically, Defendants contend that

Evans' engaged in insubordination in the form of disregarding

Peterson's directives and BHA procedures; namely, not to remove

BHA files from the workplace and not to work overtime without

prior approval.  Evans, however, introduced sufficient evidence

to place that rationale in dispute.  After taking evidence, an

Administrative Law Judge ("ALJ") for the California Board of

Unemployment Appeals issued a decision determining that Evans

was not discharged for misconduct because he neither left work

with BHA files nor did he work from home on June 2, 2005.[5]  As

such, a reasonable fact finder could find that the Defendants'

motivation in terminating Evans was in retaliation for his

constitutionally protected speech.  A reasonable fact finder

could also find that a pretextual explanation such as this one

casts doubt on Defendants' other explanations (e.g., poor job

performance, behaving in a rude and uncooperative manner) that,

standing alone, might appear to be true.  This is particularly

so given that Evans' termination letter did not reference

specific instances showing that his job performance was

inadequate, nor did it describe specific incidents illustrating

Evans' rude and uncooperative behavior.  Instead, Evans'

termination letter simply referenced the December 23, 2004 Audit

---

[5] See Baldwin v. Rice, 144 F.R.D. 102, 105-06 (E.D. Cal.
1992) (admitting decision of the California Unemployment
Insurance Appeals Board as evidence disproving employee
misconduct as a reason for plaintiff's discharge).

Report and related documents for the year ended March 31, 2004.[6]
Defendants offer no explanation as to why they waited nearly six
months to formally notify Evans' in writing that his job
performance did not meet required levels of competencies and
efficiencies.   While Peterson testified in her deposition that
she considered terminating Evans in early 2005 after his
performance on the 2004 audit, there is no evidence in the
record indicating that she ever gave Evans written counseling on
his job performance.   Nor is there evidence in the record
indicating that she ever notified Evans via written counseling
that he had acted in a rude and uncooperative behavior.   As
such, on the record presented, the Court finds as a matter of
law that Defendants did not show by clear and convincing
evidence that they would have taken the same action, regardless
of the protected speech.   A genuine issue of material fact
exists on the question of whether any adverse employment action
Defendants took against Evans was motivated by Evans' protected
speech.   Accordingly, for the reasons set forth above,

---

[6] The Court notes that the record reveals Evans was given a
positive evaluation for the period July 2003 to June 2004.   The
evaluation specifically stated that Evans performed his assigned
duties exceptionally well.   The Court further notes that the
"Summary of the Auditor's Results" for the audit year ended
March 31, 2004 states that there were no material weaknesses
identified in the financial statements or the federal awards.

Defendants are not entitled to summary judgment on Evans' First Amendment retaliation claim.

C.   Monell Liability

Defendants argue that BHA is entitled to summary judgment on the ground that there is no municipal liability pursuant to Monell v. Dep't of Soc. Servs. of New York City, 436 U.S. 658, (1978).

"Local government entities are considered 'persons' for purposes of § 1983 and can be sued directly for monetary, declaratory, or injunctive relief where 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers.' " Anderson v. Warner, 451 F.3d 1063, 1070 (9th Cir. 2006) (quoting Monell, 436 U.S. at 690).  A municipality cannot be made liable for a constitutional tort by application of the doctrine of respondeat superior, i.e., liability for constitutional torts cannot be imposed vicariously on government bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor.  Pembaur v. City of Cincinnati, 475 U.S. 469, 478 (1986); Anderson, 451 F.3d at 1070.  Rather, municipality liability can be imposed only for injuries inflicted pursuant to an official governmental policy.  Tanner v. Heise, 879 F.2d 572, 582 (9th Cir. 1989).

"To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.' " <u>Oviatt v. Pierce</u>, 954 F.2d 1470, 1474 (9th Cir. 1992); <u>Anderson</u>, 451 F.3d at 1070.   "A plaintiff may demonstrate liability by proving that a city employee committed the alleged violations pursuant to the city's official policy or custom." <u>Fuller v. City of Oakland, California</u>, 47 F.3d 1522, 1534 (9th Cir. 1995) (citing <u>Monell</u>, 436 U.S. at 694). "Alternatively, a plaintiff may show that, rather than being the product of general official policy, on a given occasion the conduct was the result of 'a deliberate choice . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " <u>Fuller,</u> 47 F.3d at 1534 (citing <u>Pembaur</u>, 475 U.S. at 483-84).   "Finally, a plaintiff may show that an official policymaker either delegated policymaking authority to a subordinate or ratified a subordinate's decision, approving the 'decision and the basis for it.' " <u>Fuller,</u> 47

F.3d at 1534   (quoting <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 126-27 (1988)).

In the present case, Evans does not point to a municipal policy or custom to support his municipal liability claim; rather, he bases this claim on the ground that his termination in violation of his First Amendment rights was caused by officials with final policymaking authority.  Specifically, Evans contends that the BHA Board, as final policymakers, directly ordered his termination by approving a contract prior to his termination on May 25, 2005, that allowed Casterline & Associates to provide "assistance in transition after departure of in-house accountant."  Defendants do not dispute that the BHA Board approved this contract.  Defendants, however, maintain that Evans failed to establish municipal liability because he did not produce sufficient evidence demonstrating that the BHA Board made the decision to terminate Evans or ratified this decision and the basis for it.  The Court agrees.  Evans did not offer sufficient evidence to create a genuine issue of material fact on the question of whether the BHA Board violated his First Amendment rights by terminating him.  The evidence before the Court indicates that Peterson terminated Evans.  Evans did not point to evidence showing the BHA Board made the decision to terminate his employment, nor is there evidence showing that the BHA Board made a deliberate choice to ratify Peterson's decision

and the basis for it.   Approving the contract with Casterline &
Associates is not the equivalent of ratifying Peterson's
decision to terminate Evans and the basis for it.   As such, BHA
cannot be held liable for the constitutional deprivation alleged
by Evans.

     To the extent Evans argues that McKeever was following an
official policy, practice or custom by declining to meet with
Evans in early May 2005 to discuss Peterson's alleged
retaliatory conduct in violation of his First Amendment rights,
the Court finds that this claim does not survive summary
judgment.   As discussed above, Evans did not demonstrate that
McKeever's failure to meet with him violated his constitutional
rights.   Moreover, Evans did not offer any evidence
demonstrating that McKeever's decision was due to an existing
BHA policy, practice or custom.   Evans did not point to a
specific BHA policy, nor did he proffer sufficient evidence
demonstrating that BHA had a custom or practice of not allowing
employees to meet with BHA Board members.   There is no evidence
of other similar incidents.   As such, BHA cannot be held liable
for the constitutional deprivation alleged by Evans.   See
Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability
for improper custom may not be predicated on isolated or
sporadic incidents; it must be founded upon practices of
sufficient duration, frequency and consistency that the conduct

has become a traditional method of carrying out policy."); <u>see</u> <u>also</u> <u>City of Okl. City v. Tuttle</u>, 471 U.S. 808, 824 (1985) (while a municipality may be liable under <u>Monell</u> for a single incident where the person causing the violation has "final policymaking authority," "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under <u>Monell</u>, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). Accordingly, the Court grants summary judgment in favor of Defendants as to BHA's liability pursuant to § 1983.

D.   <u>Qualified Immunity</u>

Defendants argue that Peterson is entitled to qualified immunity because (1) Evans has failed to establish a genuine issue of material fact regarding whether his First Amendment rights were violated, and (2) Peterson's conduct did not violate a clearly established right of which a reasonable person would have known.

Qualified Immunity serves to shield government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow</u> <u>v. Fitzgerald</u>, 457 U.S. 800, 818, (1982). The Supreme Court has established a two step inquiry in determining whether an

official has qualified immunity.   Saucier v. Katz, 533 U.S. 194, 201 (2001).   To determine whether officials are entitled to qualified immunity, the threshold inquiry is whether, taken in the light most favorable to the party asserting injury, the facts show that the official's conduct violated a constitutional right.   Id.; Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007). If a violation is established, then the court must ask whether the law forming the basis of the violation was clearly established in light of the context of the case.   Saucier, 533 U.S. at 201; Inouye, 504 F.3d at 712.   For the law to be clearly established, it is only necessary that the unlawfulness of the official's act be apparent in light of pre-existing law. Anderson v. Creighton, 483 U.S. 635, 640 (1987).   If the law did not put the official on notice that his conduct was unlawful, summary judgment based on qualified immunity is appropriate. Saucier, 533 U.S. at 202.   The qualified immunity analysis is "essentially legal" and is appropriately made on summary judgment where the underlying facts are undisputed.   Franklin v. Fox, 312 F.3d 423, 437 (9th Cir. 2002).

In the present case, the threshold inquiry is satisfied because the Court has determined above that a reasonable jury could find that Peterson violated Evans' First Amendment rights. The next question is whether, at the time of his termination, the law regarding First Amendment retaliation was clearly

established such that a reasonable official would have been on notice that such conduct was unlawful.  The Court finds that it was.  At the time of the conduct giving rise to this action, the law was clearly established that county officials cannot retaliate against employees for the exercise of First Amendment rights.  Hyland v. Wonder, 117 F.3d 405, 410 (9th Cir. 1997) (it has been established, as early as 1983 that a government employee has a right to speak on issues of public importance without being fired from public employment).  Thus, given the established state of the law at the time in question, Peterson had "fair warning" that her decision to terminate Evans for exercising his First Amendment rights was unconstitutional.  Accordingly, because a genuine issue of material facts exists on the question of whether Defendants terminated Evans for exercising his First Amendment rights, and because Peterson had "fair notice" that her alleged retaliatory conduct was unconstitutional, Peterson is not entitled to qualified immunity.

E.   Rule 56(f)

        Evans requests a continuance pursuant to Rule 56(f) to depose special agent Huhtala in order to determine whether Peterson learned of his complaint to HUD.  Evans also seeks a continuance to depose other witnesses who may have learned about

the content of his Grand Jury testimony from a member of the
Grand Jury.

A party requesting a continuance pursuant to Rule 56(f)
must identify by affidavit the specific facts that further
discovery would reveal, and explain why those facts would
preclude summary judgment.  <u>Tatum v. City and County of San
Francisco</u>, 441 F.3d 1090, 1100 (9th Cir. 2006) (citing
Fed.R.Civ.P. 56(f)).  Failure to comply with the requirements of
Rule 56(f) is a proper ground for denying discovery and
proceeding to summary judgment.  <u>See</u> <u>Weinberg v. Whatcom County</u>,
241 F.3d 746, 751 (9th Cir. 2001).  The burden is on the party
seeking additional discovery to proffer sufficient facts to show
that the evidence sought exists, and that it would prevent
summary judgment.  <u>Chance v. Pac-Tel Teletrac Inc.</u>, 242 F.3d
1151, 1161 n. 6 (9th Cir. 2001).  The district court does not
abuse its discretion by denying further discovery if the movant
has failed to diligently pursue discovery in the past.  <u>Id.</u>

In the present case, Evans did not file a Rule 56(f) motion
in support of his request for a continuance.  Instead, he
requested a continuance in his opposition to summary judgment.
The Court finds that this request inadequate under Rule 56(f) to
justify a continuance.  <u>Weinberg</u>, 241 F.3d at 751 (References in
memoranda and declarations to a need for discovery do not
qualify as motions under Rule 56(f).).  Moreover, even assuming

that Evans' request for a continuance was not procedurally deficient, the Court nonetheless finds that Evans failed to sustain his burden to justify a continuance because he failed to adequately demonstrate that he diligently pursued his previous discovery opportunities.  Accordingly, Evans' request for a continuance pursuant to Rule 56(f) is denied.

III. ORDER

For the reasons set forth above, Defendants' motion for summary judgment is DENIED as to defendant Peterson and GRANTED as to defendant BHA.

IT IS SO ORDERED.

Dated:   September 8, 2008

_____
JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE